IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF OKLAHOMA

**SHERRY LYNN FAULKNER, JANET GAIL GARVIN**

    *Plaintiffs,*          CIVIL ACTION NO: 20-CV-22-RAW

v.          **CLASS ACTION COMPLAINT**

**W.W. HASTINGS HOSPITAL,**

    *Defendant.*

**COMPLAINT**

NOW INTO COURT, come Sherry Lynn Faulkner and Janet Gail Garvin ("Plaintiffs"), on behalf of themselves and all others similarly situated, through undersigned counsel respectfully file this complaint against W.W. Hastings Hospital ("Defendant" or "Hastings") and allege as follows:

**INTRODUCTION**

Between January and April of 2018, a nurse employed by Defendant Hastings violated protocols established by the National Centers for Disease Control and Prevention ("CDC") by reusing needles, syringes and vials to administer medications to numerous patients at Defendant hospital. Failing to follow these protocols risks patient health by exposing them to bloodborne pathogens and infectious diseases, such as HIV, Hepatitis C and Hepatitis B. One hundred and eighty-six (186) or more patients have been identified as potentially exposed to such infectious diseases.

1

## **PARTIES AND JURISDICTION**

1. Plaintiffs, Sherry Lynn Faulkner and Janet Gail Garvin, both underwent surgical procedures between January and April of 2018 at The Cherokee Nation's W.W. Hastings Hospital in Tahlequah, Oklahoma. Specifically, Ms. Garvin underwent a colonoscopy in April of 2018 and Mrs. Faulkner underwent carpal tunnel surgery at Defendant hospital in February of 2018. Both Plaintiffs had their blood drawn at Defendant hospital prior to the procedures. Additionally, over one hundred and eighty (180) or more patients underwent procedures at Defendant hospital. Both named Plaintiffs are, and were at all relevant times herein, citizens of Oklahoma and all class members underwent medical procedures in Oklahoma.

2. Defendant, W.W. Hastings Hospital is an Oklahoma corporation with its principal place of business located at 100 South Bliss Avenue, Tahlequah, Oklahoma 74464. It is operated and managed by the Cherokee Nation through Indian Health Service, which is an agency within the U.S. Department of Health and Human Services. Defendant is liable for the intentional and negligent acts alleged herein, in that the acts were committed by a nurse, employed by Defendant, acting in the course and scope of his employment. Defendant Hastings includes, but is not limited to, the governing body, leadership, chief executive officer, other executive officers, board members, and/or trustees of Defendant W.W. Hastings Hospital.

3. Defendant and all Plaintiffs are citizens of Oklahoma and, therefore, complete diversity does not exist.

4. This Court has personal and subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1346(b) ("Federal Tort Claims Act" or "FTCA") because this action presents a

claim against the United States for money damages, accruing on and after January 1, 1945, for injury or personal injury caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

5. Venue is proper in the Eastern District of Oklahoma, as the actions alleged herein occurred in Tahlequah, Oklahoma, which is included within this district.

6. In accordance with 28 U.S.C. § 2401, et. seq., 28 U.S.C. § 2671, et. seq., and 28 C.F.R. § 14.2, Plaintiffs notified Indian Health Services, the United States Department of Health and Human Services, United States Attorney General William Barr, and the United States Attorney for the Eastern District of Oklahoma of their intent to pursue their claims against Defendant on February 19, 2019. As of the date of this complaint, Plaintiffs have not received a response to that notice.

## CLASS ACTION ALLEGATIONS

7. Plaintiffs bring this action on behalf of themselves, and on behalf of others similarly situated, as a class action under Rule 23(b)(3) of the Federal Rules of Civil Procedure seeking damages, costs and attorneys fees, including interest.

8. While Plaintiffs do not know the exact number of members of the class, Plaintiffs believe there are at least one hundred and eighty-six (186) persons.

9. Common questions of law and fact exist as to all members of the class, including:

   A. Whether Defendant intentionally inflicted emotional distress on Plaintiffs and all class members;

    B. Whether Defendant's negligence caused Plaintiffs and all class members emotional distress;

    C. Whether Plaintiffs and all class members are entitled to damages, and, if so, the proper measure of damages.

10. Plaintiffs' claims are typical of the claims of the class, and Plaintiffs will fairly and adequately protect the interests of the class. Plaintiffs and all members of the class are similarly affected by Defendants' wrongful conduct in that they all suffered severe emotional distress upon learning of their exposure to bloodborne pathogens while under the care of Defendant hospital.

11. Plaintiffs claims arise out of the same common course of conduct giving rise to the claims of the other class members. Plaintiffs' interests are coincident with, and not antagonistic to, those of the other members of the class.

12. Plaintiffs are represented by counsel who are competent and experienced in the prosecution of class action litigation.

13. The questions of fact and law common to members of the class predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

14. Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense that numerous individual actions would engender. The benefit of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining

redress for claims that it might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

## FACTUAL ALLEGATIONS

15. The foregoing paragraphs are incorporated here by reference, as if set forth in full.

16. In 2018, Plaintiffs, Sherry Lynn Faulkner and Janet Gail Garvin and all class members, underwent surgical procedures at The Cherokee Nation's W.W. Hastings Hospital in Tahlequah, Oklahoma, which is an agency within the U.S. Department of Health and Human Services. Specifically, Ms. Garvin underwent a colonoscopy in April of 2018 and Mrs. Faulkner underwent carpal tunnel surgery in February of 2018. Additionally, over one hundred and eighty (180) or more patients underwent procedures at Defendant hospital. Plaintiffs all had their blood drawn, or received intravenous medical treatment, at Defendant hospital.

17. All Plaintiffs were exposed to bloodborne pathogens and infectious diseases, namely, HIV, Hepatitis C and Hepatitis B, when an employee-nurse of Defendant violated protocols by reusing syringes, needles and vials to administer medications into intravenous bags.

18. On Tuesday, May 22, 2018, Ms. Garvin received a telephone call from an employee of Defendant, who explained to her that she may have been exposed to HIV and Hepatitis C during the course and scope of the procedures performed at Hastings. The caller instructed her to undergo blood screenings at three-month intervals, for a period of nine months, in order to monitor whether she has been infected with one of these diseases. Ms. Garvin underwent blood screening for infectious diseases at Redbird Smith Health Center in Sallisaw, Oklahoma.

19. On June 11, 2018, upon learning of the potential exposure of several patients of Hastings, Mrs. Faulkner reached out to Defendant to inquire if she had been exposed to any infectious disease during her procedures. Mrs. Faulkner was informed, by an employee of Hastings, that she was on "the list" and would need to come in for testing. Mrs. Faulkner underwent blood screening for infectious diseases at Redbird Smith Health Center in Sallisaw, Oklahoma.

20. The remaining members of the class received similar notifications from Defendant Hastings and were advised to undergo blood testing for bloodborne pathogens and infectious diseases.

21. Plaintiffs provided notice of their tort claims under the Federal Tort Claims Act to all relevant agencies on February 19, 2019

### CDC Protocols for Controlling Spread of Bloodborne Pathogens

22. Bloodborne pathogens are diseases that can be spread though contamination by blood or other bodily fluids.

23. The pathogens of primary concern are HIV, Hepatitis B and Hepatitis C, though others exist, including, but not limited to, syphilis, malaria, babesiosis, brucellosis, cytomegalovirus, leptospirosis, arboviral infections, relapsing fever, Cruetzfeldt-Jakob disease, human T-lymphotropic virus type I and viral hemorrhagic fever.[1]

24. Perhaps stating the obvious, prevention of the spread of bloodborne pathogens and infectious diseases is of utmost importance in a hospital setting.

---

[1] IHS Facility "Exposure Control Plan," from https://www.ihs.gov/ihm/circulars/1992/circular-9204-apx-924b/, accessed December 13, 2019.

25. In order to decrease transmission of such bloodborne pathogens, the CDC recommends strict adherence to recommended infection control practices.

26. One way to protect patient safety from preventable contamination with bloodborne pathogens is through safe injection practices.

27. The CDC defines "[u]nsafe injection practices" as "include[ing], but are not limited to, reuse of syringes for multiple patients or to access shared medications, administration of medication from a single-dose/single-use vial to multiple patients, and failure to use aseptic technique when preparing and administering injections."

28. Conversely, safe injection practices include one-time use of needles and syringes and limiting sharing of medication vials.[2]

29. The CDC's 2007 Guide for Isolation Precautions: Preventing Transmission of Infectious Agents in Healthcare Settings states that providers should never "administer medications from a syringe to multiple patients, even if the needle or cannula on the syringe is changed. Needles, cannulae and syringes are sterile, single-use items; they should not be reused for another patient nor to access a medication or solution that might be used for a subsequent patient."[3]

30. The same guide also recommends that providers "[u]se fluid infusion and administration sets (i.e., intravenous bags, tubing and connectors) for one patient only and dispose appropriately after use. Consider a syringe or needle/cannula contaminated once it has been used to enter or connect to a patient's intravenous infusion bag or administration set."[4]

---

[2] "Protect Patients Against Preventable Harm from Improper Use of Single-Dose/Single-Use Vials," from https://www.cdc.gov/injectionsafety/cdcposition-singleusevial.html, accessed on December 13, 2019.
[3] "Safe Injection Practices to Prevent Transmission of Infections to Patients," 2007 Guideline for Isolation Precautions: Preventing Transmission of Infectious Agents in Healthcare Settings, from https://www.cdc.gov/injectionsafety/ip07_standardprecaution.html, accessed on December 13, 2019.
[4] *Id.*

31. Essentially, reusing needles or syringes can spread bloodborne pathogens from patient to patient, putting them at risk of contracting Hepatitis C, Hepatitis B and HIV.[5]

32. Because of the importance of such policies and protocols, the CDC requires healthcare providers, like Defendant to "demonstrate a commitment to preventing transmission of infectious agents by incorporating infection control into the objectives of the organization's patient and occupational safety programs."

33. Providers have a duty to ensure that staff under their supervision "[n]ever administer medications from the same syringe to more than one patient, even if the needle is changed" and "[d]o not enter a vial with a used syringe or needle."

34. Hospitals, such as Defendant, have a duty to protect patient safety by ensuring injection safety and other infection control practices are carried out by staff and employees.[6]

### Indian Health Service's Bloodborne Pathogen Exposure Policy

35. Indian Health Services, ("IHS") requires each IHS facility to have departmental policies and procedures to control exposure to bloodborne pathogens.[7]

36. Such an Exposure Control Plan requires the following regarding contaminated needles:

> Contaminated needles and other contaminated sharps shall not be bent, recapped or removed unless the supervisor can demonstrate that no alternative is feasible or that such action is required by a specific medical procedure. Recapping shall only be accomplished using a mechanical device or by using a "one handed" technique. Immediately or as soon as possible after use, contaminated reusable sharps shall be placed in appropriate containers until properly reprocessed. These containers shall be puncture resistant, leak-proof on the sides and bottom, and labeled or color-coded.[8]

---

[5] "A Patient Safety Threat – Syringe Reuse," from https://www.cdc.gov/injectionsafety/patients/syringereuse_faqs.html, accessed on December 16, 2019.
[6] "Information for Providers," from https://www.cdc.gov/injectionsafety/providers.html, accessed on December 16, 2019.
[7] Bloodborne Pathogen Exposure Policy, from https://www.ihs.gov/ihm/circulars/1992/bloodborne-pathogen-exposure-policy/#5, accessed December 13, 2019.
[8] *Id.*

37. Employees are required to be provided interactive training on bloodborne pathogens in general and their employer facility's Exposure Control Plan specifically on an annual basis.

38. At the local facility level, the Service Unit Director is responsible for the implementation of the requirements of the Bloodborne Pathogen Exposure Control Plan.

39. Defendant Hastings has a duty to comply not only with the CDC protocols for injection safety, but also with the policies mandated by IHS.

## Oklahoma Safe Injection Practices

40. Oklahoma statutes and regulations, too, also contain requirements for infection control.

41. The Oklahoma Department of Health recommends that providers follow safe injection practices, including, but not limited to "use of sterile, single-use, disposable needles and syringes for each injection given and preventing contamination of medication and equipment."[9]

42. Registered nurses are required by statute to adhere to protocols "established or endorsed by nationally recognized professional medical organizations, societies, associations and federal agencies." 63 O.S. § 1-290.2(B).

43. Hospitals, such as Defendant, must "have a written exposure control plan for risk exposure to bloodborne pathogens." 63 O.S. § 1-539.3(A)(1).

44. The Oklahoma Administrative Code mandates hospitals, such as Defendant:

> establish an infection control program to provide a sanitary environment and avoid sources and transmission of infections. The program shall include written policies and procedures for identifying, reporting, evaluating and maintaining records of infections among patients and personnel, for ongoing review and evaluation of all aseptic, isolation and sanitation techniques employed in the hospital, and

---

[9] "2012 Infection Prevention and Control Manual," page 24, from https://www.ok.gov/health2/documents/Final%202012.pdf, accessed on December 17, 2019.

development and coordination of training programs in infection control for all hospital personnel.

Oklahoma Administrative Code 310:667-13-1

45. Further, infection control policies and procedures require all employees to undergo a new employee orientation, and subsequent continuing education, concerning such infection control.

Oklahoma Administrative Code 310:667-13-4

### CMS Survey Finds Protocols Breached

46. On July 18, 2018, the Department of Health and Human Services Centers for Medicare & Medicaid Services, ("CMS") investigated Defendant Hastings, and found that both its nursing services and infection control were out of compliance for participation in Medicare and Medicaid Programs. [10]

47. This survey was conducted after an allegation was made that a nurse employed by Defendant reused the same medication filled syringe on multiple patients, including patients who were infected with Hepatitis C and HIV.[11]

39. Defendant's Director of Quality was interviewed by CMS and confirmed that the employee nurse "used the same needle and syringe on several different patients until the needle was dull, usually at the end of the day."[12]

---

[10] CMS Federal Complaint Survey, W.W. Hastings Hospital, from https://www.cherokeephoenix.org/Documents/2018/8/62514_nws_180823_HastingsCompliance.pdf, accessed on December 12, 2019.
[11] *Id.,* page 2.
[12] *Id.*

40. After identifying that one-hundred and eighty-six patients had been exposed to bloodborne pathogens, the patients were contacted by telephone where a "script" was recited to them. This script was written and approved by a committee formed by Defendant.[13]

41. The script that was written and approved by Defendant told patients that there had been "a lapse in protocol at W.W. Hastings Hospital" and that Defendant was "providing testing to any patient that this might affect." [14]

42. Defendant's employees failed to inform patients the extent of the lapse in protocol or for which diseases they were to tested, a violation of Plaintiff patients' right to informed consent. 42 CFR 482.13(b)(2).

43. CMS found that Defendant failed to have a comprehensive Nurse Training Program, in violation of 42 CFR 482.23.[15]

44. Further observation revealed that Defendant hospital "failed to have an effective Infection Control Program. The failed practice placed the patients in the Operating Room, Recovery Room, and Post Operative Room at risk for cross contamination and negative outcomes," a violation of 42 CFR 482.42.[16]

45. These observations included nursing staff handling medical equipment without gloves, failing to sanitize a glucometer after use, walking across medical units with uncovered needles (both used and unused), mixing IV medications at unsanitary stations, failing to clean medication stations, failing to secure or cover sterile equipment, and failing to change masks gowns and skull caps either prior to entering or after exiting the operating room.[17]

---

[13] *Id.*, page 3.
[14] *Id.*
[15] *Id.*, page 6.
[16] *Id.*, page 16.
[17] *Id.* pages 16 through 19.

46. If both CDC and IHS protocols had been in place and enforced at Defendant hospital, Plaintiffs would not have been exposed to bloodborne pathogens while under the care of Defendant hospital and would not have sustained the injuries alleged herein.

47. The failures to comply with CDC and IHS protocols were present throughout all relevant time periods, and after, including all of the Plaintiffs' surgery dates.

48. Defendant knew, or should have known, that failure to implement, enforce, and train nursing staff to follow CDC and IHS protocols for infection control and injection safety placed patients at risk.

49. Oklahoma law requires that hospitals, like Defendant, operating within the state comply with national standards. 76 OK Stat § 20.1.

## CLAIMS FOR RELIEF

### COUNT I
### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

50. The foregoing paragraphs are incorporated here by reference, as if set forth in full.

51. With respect to the conduct described above, Defendant acted both intentionally and recklessly by failing to comply with the protocols and regulations described above.

52. Defendant's failure to adequately supervise and enforce safe injection practices was both intentional and reckless.

53. It was both intentional and reckless for Defendant's employee to reuse needles and syringes on multiple patients, including those infected with HIV and/or Hepatitis C, until they are dull in order to save time.

54. Such described conduct was extreme, outrageous, and so totally and completely exceeded the bounds of acceptable social interaction that the law must provide redress.

55. Such conduct caused Plaintiffs to suffer severe emotional distress.

## COUNT II

## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

56. The foregoing paragraphs are incorporated here by reference, as if set forth in full.

57. At all relevant times, Defendant had a legal duty to establish infection control policies, which includes injection safety, which meets or exceeds the standards cited above.

58. At all relevant times, Defendant had a duty to enforce its infection control policies, which includes supervision of its employees for compliance.

59. At all relevant times, Defendant had a duty to train its employees, including nurses, on its infection control policies and the importance of safe injection practices.

60. Defendant breached this duty when it failed to adequately train and supervise a nurse employee who grossly violated injection safety and infection control policies.

61. This breach caused Plaintiffs to suffer the severe emotional distress of fear of being infected with an unknown number of bloodborne pathogens while under the care of Defendant.

62. Such injury was both caused by a physical injury and inflicted further physical injury in that the potential infection was caused by piercing the skin of Plaintiffs with non-sterile needles and resulted in the need for further invasive blood testing.

63. Under Oklahoma law, "[i]n any action arising from negligence in the rendering of medical care, a presumption of negligence shall arise if the following foundation facts are first established:

   1. The plaintiff sustained any injury;
   2. Said injury was proximately caused by an instrumentality solely within the control of the defendant or defendants; and
   3. Such injury does not ordinarily occur under the circumstances absent negligence on the part of the defendant.

76 OK Stat § 21

64. Plaintiffs claims are entitled to the presumption of negligence, as they sustained the injury of severe emotional distress that was proximately caused by the actions of Defendant's employee in the course and scope of his employment by Defendant. Such injury, and exposure to bloodborne pathogens through the use of non-sterile needles, does not ordinarily occur under any circumstances absent Defendant employees negligence and failure to comply with federal, state, and hospital protocols.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs requests that this Court enter judgment on their behalf, against the Defendant, adjudging and decreeing that:

a. Defendant intentionally caused the emotional distress of Plaintiffs by causing them to fear infection of a bloodborne pathogen through Defendant's use of non-sterile needles and syringes;

b. Defendant was negligent in its failure to comply with federal, state, and hospital protocols and regulations; and that negligence caused Plaintiffs to suffer severe emotional distress;

c. Judgment be entered against Defendant and in favor of Plaintiffs for compensation for the injuries sustained, together with the costs of suit, including reasonable attorneys' fees;

d. Plaintiffs be awarded such additional relief as may be required and that the Court may deem just and proper under the circumstances; and

e. Plaintiffs be awarded just compensation for their injuries in the amount of $125,000 each.

## **JURY DEMAND**

65. Plaintiffs demand a jury on all issues so triable.

Respectfully submitted, this 22nd day of January, 2020.

By: _____/s/ Fourth Scoufos_____
Fourth Scoufos, O.B.A. #17135
SCOUFOS LAW OFFICES, P.C.
P.O. Box 787
101 E. Creek Avenue
Sallisaw, OK 74055
(918) 775-5546 – *voice*
(918) 775-4990 – *fax*
fourth@scoufoslaw.com

ATTORNEY FOR PLAINTIFFS